Mr. Nguyen, I'd like to reserve two minutes for rebuttal, if that's appropriate. Also, I have a bit of a visual aid, which is just a blowup of the verdict chart summary in our brief that's already in our brief. Mr. Nguyen, I just might mention I can't see that. Did you put that on a little separate sheet of paper that you could pass out to us? I did not, Your Honors. Actually, in the appellant's opening brief. Oh, all right. It's at pages – all right, thank you. It's pages – let's see if I can direct the Court to that. It's on page 19 through 21 of the appellant's opening brief. Thank you. Thank you very much, Your Honors. Your Honors, this case raises many legal issues, which we will go over today. But ultimately, there's two themes I want to highlight for the Court. First, there's a practical question of fairness. How can it be fair for my client, Timsta, to have been left worse off after the second trial, after it finally got its day before the jury and got better findings from the jury than it got before Judge Tervezian at the 2004 trial of the same case? The jury, in what was really a David and Goliath case, worked hard, followed the instructions and verdict form that Quicksilver wrote, and found for my client not once, but twice, first with the verdict on liability in my client's favor, and second on the defense of statutory innocent use. But what you're appealing now is the injunction, the equitable bench trial that the Court conducted. Isn't that right? That's correct, Your Honor. But even before you get to the equitable phase of trial, what we're contending is the district court erred in even ordering redeliberation because we would not have gotten to the bench trial if the first verdict stood, and we would not have gotten to the bench trial if the statutory innocent use defense was ruled in favor of my client on both of Quicksilver's claims. Okay. So before you even get to equitable issues, there are fairness issues about what happened before that. Does the innocent use defense apply to false claims of origin? Your Honor, our position is that it does. What cases support that position? Your Honor, this Court's decision in Lord Simon-Cairns v. Franklin Mint Company addresses the issue in a different respect. Basically there, there were claims for false advertising and false endorsement under 1125A, the same statuette issue here, and there this panel of this circuit affirmed application of one of the statutory 1115B defenses under D4, nominative fair use, to an 1125A claim. In addition, this Court's ruling in Golden Door affirmed application of the 1115B-5 defense at issue here in its common law use form against a false designation of origin and a trademark infringement claim. There are also a litany of cases from other jurisdictions and lower courts which find that it would be incongruous to not apply the defense to false designation of origin when it's applicable to trademark infringement because they're essentially mirror images of each other. That's what I was going to ask you. I don't quite get the distinction between the 120, the 1125 and the 1114 claims. What is the difference? Is it who can bring it or is it the remedies or what? It's about who can bring it, Your Honor. The main difference is 1114 is reserved only for holders of a registered trademark. 1125A can be asserted by both registered trademark owners and owners of common law unregistered marks. So 1125A is available to more people, but it doesn't necessarily mean that it's different in terms of the proof that's required or the elements of the cause of action than a claim under 1114 for Federal trademark infringement. Are the remedies the same? The remedies are essentially the same, Your Honor. You can get injunctive relief. You can get disgorgement of profits. You can get damages. So essentially the two causes of action are similar. Same proof, same elements. Quicksilver even acknowledged that below in its arguments in both its memorandum of contentions of fact and law to the court and to its arguments to the jury. The cases and the law and the evidence treat both really the same. Because of that, as a policy matter, it would be incongruous to say a defendant like my client could have the defense for 1114 but then be left with an injunction against it under 1125A. In addition, if the court were to frame a rule of law that were to apply the defense to just one but not the other, it would eviscerate all of the defenses that are listed under 1115B. There's other defenses such as abandonment of a trademark, use of a trademark in violation of antitrust principles, equitable defenses such as laches and estoppel. They're all listed under 1115B. If this court were to rule that those defenses only apply to 1114 and not to 1125A claims, that doesn't make any sense because clearly laches and estoppel and abandonment of a trademark could apply against an 1125A claim for the same reason the statutory defense of innocent use should be applicable against both. Speaking of laches, first time around you prevailed on laches with Judge Terizian. Correct, Your Honor. They didn't appeal it. Comes up to the Ninth Circuit. We reverse it on other grounds. Yes. Gets tried again. Have a new judge this time. This judge decides that under the law of the case there have been changes in circumstances, I guess. Why isn't she entitled to do that? Your Honor, the district court, we acknowledge, has discretion to revisit law of the case and to depart from it, but the law of this circuit makes clear that the discretion is in extraordinary circumstances and sparingly applied. This is not one of those instances. There were four instances of evidence that the district court and Quixel recited to try and justify why this was substantially different. The best way to characterize the evidence at this trial was that it wasn't different in nature than what happened before Judge Terizian. It was just a different quantum of evidence on the same issues. Why isn't that sufficient? Well, this court recognized in Minidoka Irrigation District, which is a Ninth Circuit case, that merely having a greater quantum of evidence that's not of a substantially different nature is not sufficient to depart from law of the case. And, for example, the main difference cited by the district court is supposedly the use of the Internet from a difference between 2004 and 2008. Quite frankly, Your Honors, the Internet existed back in 2004. Quixelver, the evidence showed, was doing Internet marketing back in 2004. There was nothing new or different that happened in those four years on the Internet which somehow changed the entire picture to justify departure from law of the case. Quixelver in its brief suggests that somehow my client started marketing on the Internet during those four years. That's not true. The undisputed evidence showed that my client never marketed on the Internet. It doesn't have to. It's a wholesaler. It doesn't market to consumers. The only difference was that retailers, there was some evidence showing that they started referring to the Roxyware brand on the Internet. But the admissions at trial demonstrated that there was no confusion that was actually found because of that Internet usage. So it's kind of one of those supposed new facts that doesn't make any difference. Who cares? It didn't change the landscape. Similarly, one of the district court's findings for departing from law of the case conflicted with the jury's findings on its verdict form. And this is a second theme that's important to keep in mind, the conflict between the district court and the jury. The district court found that my client moved from the junior sportswear category to the contemporary sportswear category. And that move, the district court said, well, that's new evidence. But the jury on the innocent use defense found that my client developed a zone of reputation for its Roxyware mark and that it continuously used that same mark in the same zone of reputation, even after it moved from junior to contemporary. So for the district court to find that somehow this was something new directly conflicts with the jury's finding that it was a continuous use of the same mark in the same zone of reputation. That's review de novo, the conflict between the jury's findings and the district court's. And that justifies reversal on the law of the case issue. Finally, Your Honors, the third area of evidence the district court highlighted was evidence for fear of my client's willingness to expand its usage or license its mark. Those were expressed at the 2004 trial. One of the pieces of evidence cited by Quicksilver to justify this was deposition testimony from one of my client's principals in 2003 that was actually cited at the 2004 trial. So there was nothing new. With respect to the Latches analysis itself, if Latches, as law of the case, were set aside and the Latches factors were analyzed anew, we believe the district court still erred. Again, its findings conflicted with the jury findings. For example, the second factor, which was a key one, about whether Quicksilver would be harmed if it wasn't entitled to relief despite its delay in suing. There, the district court found, yeah, Quicksilver will be harmed. But keep in mind, the jury found no harm to Quicksilver, even though these parties coexisted in the marketplace for 16 years, 1992 through 2008. And the district court then concludes, okay, once this trial is over, wow, Quicksilver is suddenly going to be irreparably harmed if it doesn't get some relief, even though it waited too long to sue. I want to ask you about the relief you want us to do. Now, if I recall correctly, there are no money damages against you. Is that correct? That's correct. We're just talking about the scope of the injunction. That's correct. After the first trial, the injunction said you could keep on doing only what you were doing, but you couldn't expand further. Essentially, yes. The second time around, the judge puts you out of business, basically, in 18 months. Correct. Are you asking us then to put you back where you were after the first trial, that you can just do what you had been doing but nothing else? No, Your Honor. We're asking that the entire judgment be reversed and actually judgment be entered in favor of Kempsta and no injunction be left against Kempsta. Based on the first verdict, where liability was not found against Kempsta, we should have had a defense verdict. On the instant-use defense, that's a complete defense, as the law of this circuit makes clear. That would give us a complete victory. As to what? As to the scope of the injunction? As to liability on either cause of action, so that based on the instant-use defense, there should be no remedy, no relief granted to Quicksilver. After the first trial, did you appeal the scope of the injunction or was it just these other things? I did appeal the scope of the injunction, Your Honor. And because of the way in which the appellate ruling came out, the Ninth Circuit decision did not have to reach that issue because it ruled that the jury should have decided the liability questions, not Judge Kavrizian. So based on the scope that we're seeking, we're seeking entry of judgment in favor of Kempsta, not a limitation of the scope of injunction. As a fallback maneuver to the fallback measure, in the event that this Court deems that some injunction is appropriate because the district court did not make this litany of errors we listed, then we believe that the injunction should be narrowed because the law makes clear that an injunction can only be issued to address harm found. And the jury found no harm despite 16 years. To the extent there was any confusion whatsoever, it was very limited among a very small amount of retail buyers. There was no evidence concretely of consumer confusion, which is the purpose of trademark law is to protect consumers from being confused. So any injunction that should have been issued we think should have been exceptionally narrow and not the complete injunction at that issue here. Thank you, Mr. Lin. Did you want to save a couple of minutes, you said? Yes, Your Honor. Thank you, sir. Good morning. Good morning, Your Honors. May it please the Court, John Hacker with O'Melvyn Myers for Applee Quicksilver. Your Honors, we think Judge Baker Fairbank did exactly what is expected of a district judge under these circumstances. I want to start first with Kemp's arguments that the verdicts, the original verdicts were inconsistent in the harm finding, and then I'll turn to the innocent use question and the latches issues. We think the inconsistent verdicts, Your Honor, the original verdicts that Kemp's arguments concerning those verdicts are irrelevant. And the reason they're irrelevant is that the jury was only asked about whether or not Quicksilver had ever suffered past harm. This trial was solely about, there's only one claim for relief here, and that's a claim for a future forward-looking equitable relief. The question to the jury about past harm had absolutely nothing to do with that question, so it's categorically irrelevant. Second of all, the Court, because this was a forward-looking case, a case about forward-looking equitable relief, that question, the question whether or not there was future irreparable injury was solely for the Court, and the Court made its own independent findings based both on the record from the trial before the jury and the subsequent bench trial. What she found are basically four things. First of all, that there was going to be an increase, or had been, and would in the future be an increase in Internet marketing. And it's true, not by Kemp's stuff, but rather by the retailers that were selling Kemp's stuff products, and that's so important because of the next finding she made, that Kemp's stuff, as it admitted, based on substantial evidence, Kemp's stuff can't control what the retailers are doing. So we have undisputed fact that there was more increased Internet marketing of Kemp's stuff products using the Roxyware label, and that's the key. The retailers are using Roxyware now to sell Kemp's stuff products. This came out at the second trial. Yes. It wasn't available at the first trial. That's correct. Why shouldn't you have proven it in the first trial or you're out? Why do you get another shot at this? Well, the issue, when it's remanded, it's remanded for a new trial and new fact finding. There's no limitation to the kind of evidence. It doesn't appeal, Judge Terizian's ruling, that you were guilty of latches. Well, on the latches question, I think it's a different question, Your Honor, because at that point, at that time, there wasn't evidence that this was a problem. And so we were only challenging, in the first trial, new and expanded uses. We didn't understand that there was any problem with Internet marketing because there wasn't. That evidence came up after the first trial. It didn't exist the first time. So there couldn't have been fact finding or a claim made on that basis. That was the new, that was one of the, and I'll get to latches in a moment, but that was one of the critical pieces of new evidence that justified and supported Judge Baker Fairbank's finding. But let me get to a third crucial element of her finding that demonstrated that there's going to be future harm, and that is the nature of the Internet marketing. There was evidence, for example, of Roxyware, Kimster's product, being used in a sexually suggestive way on the Internet, which is fundamentally inconsistent and damaging to the brand that Quicksilver had spent years and millions of dollars to develop, which is a wholesome, you know, tween, teen, hip, beachwear kind of image, not the kind of thing that Kimster was selling and not the kind of thing that retailers were using in selling the Roxyware product. And so that inconsistent message, Judge Baker Fairbank correctly recognized, was going to do damage and was likely to do damage to the Quicksilver brand in the future. And finally, separate from the problem of Internet marketing. Excuse me. Wasn't there a complete lack of evidence that any consumer ever mistook Quicksilver Roxy and Roxyware for the same manufacturer? But that's true, Your Honor, but that would only go to the past harm. If we were bringing a case that says you have been using our mark, there's infringement, and here's the damage that's caused. Here are all the consumers. But doesn't that inform future harm? I mean, how do we decide they're going to be confused in the future when we have evidence that they have never been confused in the past and it appears that their market is diverging. It used to be somewhat similar, same age group at least, and now it's diverging into an older age group, a higher quality product. Nobody was ever confused when the same purchasers might be looking at the same, at both manufacturers' products. And now we're even going to have an older group looking at higher end merchandise. Can't we say if they were never confused in the past, it's speculative suggests that confusion is going to happen in the future? Several answers, Your Honor. First of all, that goes, well, first of all, all of that evidence and those arguments were before Judge Baker-Fairbank, and she found, as a matter of fact, that we had established likely future harm. But second of all, it goes precisely to the point I'm talking about. The change in the way that Kimsta products were being marketed through the Internet, that hadn't existed in the past. You have to understand the way that Kimsta was marketing. They don't market, as my colleague just said, they don't market directly to consumers, so there wouldn't be consumer confusion out there. They deal with a limited number of retailers who know the product, not because of the Roxyware label, but because of the maker's reputation. It's a good product. Retailers know and like that product. They don't care about the Roxyware label. So there wasn't going to be confusion out there among consumers, and that's one of the reasons we didn't bring a damages claim. The problem was, going forward, the court recognized that retailers were now starting to use the Roxyware as a marketing tool and there was going to be creating a conflicting message with the Quicksilver products. And the fact that, I mean, Kimsta argues, they assert that the products were diverging, but again, the district judge disagreed with that. And one of the reasons is, I don't think it's our burden to re-justify it, but one of the reasons is people grow up with, young girls, tweens and teens grow up with, a particular image of Quicksilver Roxy and Roxy, and then as they get older, they see, if this is allowed to go unfettered, they see Roxyware. And they think, oh, that's the product that I know and love from when I was younger. I'm going to continue to use that product to the extent they identify that Roxyware is used to market to consumers ever. And that's the problem in the future. But the third point I would make, Your Honor, is this court's cases have conclusively held, repeatedly held, that the existence of confusion alone establishes harm that entitles you to whatever remedy you can prove. And so the likely confusion alone suffices to establish harm entitling us to some kind of relief, whatever the court deems appropriate in the court's discretion to issue a remedy. And the court here said, unless Kimsta is enjoined from using Roxyware, there is a serious risk. First of all, she found, as a matter of fact, that the brand was going to be damaged, the Roxy and Quicksilver Roxy brand, that we had spent so much money and so much effort over the years to develop a brand association that's going to be damaged in my association by the different uses by retailers. Why wasn't Judge Teruzian's original injunction sufficient to protect you from that? Well, because at the time, I think the key problem there is the inability to control retailers. The injunction limited Kimsta to its existing use and prevented Kimsta from doing new and expanded uses. But the injunction can't control retailers. And so if retailers are out there, if Kimsta is selling a Roxyware product and then retailers start marketing on the Internet Roxyware, sexy, you know, fashionable women's, you know, nighttime apparel. Okay, but why can't they do that? Why can't? Why can't the retailers sell it any way they like? And that's exactly the point, Your Honor. That's exactly the point. Retailers are entitled to do that. We can't. The court couldn't enjoin retailers. But that's the problem, because Kimsta using Roxyware, which everybody agrees, by the way, is infringing. Nobody disputes that. That's stipulated, that Roxyware infringes on the valuable Roxy and Quicksilver Roxymark. And that's precisely the problem. If it's allowed to use it the same way it's used before, it's going to create the kind of harms in the future that I've talked about. Because of the increased use of the Internet, merging of consumers who are looking at things on the Internet, likely to see things more together than in the past. That's why it's not true that they're diverging. And because of the way that retailers can see that Roxy has a great value. That's part of the whole problem here. It's a free-riding problem. Retailers know that Roxy has an enormous value. And if they get a Roxyware product, of course they're going to use that. Of course they're going to try to ride on the Roxyware brand. And that's precisely what Judge Baker Fairbank saw and understood in saying that limiting Quicksilver to its – excuse me, limiting Quicksilver to its prior use wouldn't be sufficient to prevent the harm to Quicksilver that's going to stem from that use. I'd like to turn, then, to the innocent use defense, if I might. Unless the Court has any other questions on the harm issue. Our position on innocent use, Your Honors, is that statutory innocent use is addressed only to infringement of registration rights created under 1114. That's what 1114 is about. It's about infringement of rights that stem from a registered mark. That's what statutory innocent use is about. 1125, the false designation of origin, is about something very different. It's about common law rights and infringement of the rights you have in a common law mark. And I think my colleague made a mistake earlier when he said they're the same kind of proof and the same elements. They absolutely are not, and that's so important to understand. Under 1125, to establish infringement, you cannot rely on any presumption of validity from the registration. It's totally meaningless. In order to establish validity under 1125 in common law rights, you have to establish the basics of a common law mark. And that includes establishing validity without a presumption by establishing inherent distinctiveness or secondary meaning. You're saying in an 1125 claim the fact of registration is irrelevant? Categorically irrelevant. Meaningless. Are there cases that say that? Yeah, the Tupesos case, I believe, supports that. I didn't find that. I was looking for that, and I could not find that principle. Well, certainly the jury was instructed. The instructions presume that. Well, I'm not sure the instructions were correct. I'm trying to find the authority for the proposition that the elements are different. Well, if you look at it, you can look at the statute itself. 1114 says infringement of a registered mark. 1125 says you have to establish common law mark and common law validity. There's nothing in there about validity. I understand that. But then I also thought that once they introduced the fact that they have a registered mark, that gets them over the – gets the plaintiff over the hurdle. I don't think it does as a matter of law. There's no case I've seen that says that. And that's certainly not how the defense fell off. Why wouldn't it be? As a matter of logic, why wouldn't that be? Because it's a different kind of claim. As my colleague agrees, I think when you're trying to prove a common law mark, you get – as Kemp explains in the reply, when you have a registered mark, you get some benefits from that. And that benefit is nationwide presumption. You don't have that presumption in 1125. That's why they're different claims. You wouldn't need 1125 if the registration got you everywhere. 1125 is for proving a common law – that you have common law rights. If you have a registered mark, you can bring two types of claim. You can bring – and you can bring them simultaneously. You can say, you infringed my registration rights, and I've got such a good mark that I don't even need to rely on registration. I've got common law rights, too. And that's what the jury below was instructed to find. What additional proof did you offer on the 1125 that wouldn't have applied on 1114? And here's exactly why the evidence overlapped. The additional proof actually wasn't a different type of evidence because Kempsta tried to rebut the presumption of validity that comes from a registration. So under the 1114 claim, there's a huge fight in the evidence as to whether or not the presumption was worth anything because Kempsta argued that – tried to rebut it by saying it's not inherently distinctive and there's no secondary meaning, which you can do. So there's a fight under that. That evidence then applied directly to 1125 because we said, jury, we have shown you the evidence that establishes that there's an inherently distinctive meaning. The Roxy is like Apple computer. Although Roxy may be a word with certain types of meaning, it's arbitrary when associated with software. The jury accepted that evidence, necessarily accepted it under 1114 and we know necessarily accepted it under 1125, that it was an inherently distinctive mark and had secondary meaning. The jury was required to find that and did find it. And so under 1125, we established a common law claim and when a plaintiff trademark holder, common law trademark holder, brings a common law claim, it's subject only to common law defenses. And that's why, again, my colleague here has been saying it makes no sense, he suggests, to say that the common law statutory innocent use defense doesn't apply to a 1125 claim because then there would be no defenses. That's absolutely incorrect because all the defenses, all the common law defenses still apply under 1125. We accept that. The only question here is whether the common law innocent use defense is the same as the narrower, weaker statutory innocent use defense that this Court identified in Quicksilver I. And there's absolutely no reason to do that. Again, look at Kempster's own argument. Their position is when you have a registration, you get lots of benefits for that. But you have to pay a price for the benefits. And the price you pay is the weaker statutory innocent use defense. But under 1125, you don't get the benefit. And so you don't pay the price. You're bringing a common law claim, you are subject only to common law defenses. You can look at the text of 1115 itself. The text of 1115 makes absolutely clear, it's very explicit about this, that the statutory innocent use defenses described there go only to rebutting the inference that comes from incontestability. The subpoena court's case in Park and Fly and the Tenth Circuit's case in GTE cited by Kempster state this explicitly, that they're only about rebutting the evidence, the evidentiary inference that comes from registration. So it's all about registration. That's what those innocent use defenses are about. Because registration isn't relevant under 1125 when you're bringing a common law defense. You're subject necessarily, logically subject only to the common law defense. If I can just say one final word about Latches, both on the evidence that led her to make a new finding on that and the merits. It's really the same point. And that is two basic points. She found new evidence of Internet marketing and very most importantly, I think, the evidence, the admission from Kempster's 30B6 witness that the label can be used interchangeably. There's literally no harm at all from being enjoined. It's not true, Your Honor, the way I think you're describing their argument when you say the injunction put them out of business. It didn't at all. The label isn't worth any economic value to them. Yes, there was continuous use and some goodwill in it, but the change was that they were no longer relying on where they'd invested it with juniors. They just moved it over to another line where they had other labels before and there was no evidence whatsoever. In fact, to the contrary, indication from Kempster that there's no harm, there's no value, economic value on the mark. Thanks, Mr. Hacker. Mr. Nguyen, you've got a couple of minutes left. Thank you, Your Honors. By way of rebuttal, I just want to address a few points. On the first point raised by Quicksilver's counsel about the inconsistent verdict,  that is the standard set by the law of this circuit and the Supreme Court. At most, the district court only recognized there was a potential inconsistency. Isn't it a clear inconsistency where on the trademark they said there was a likelihood of confusion and on the false designation of origin they said there wasn't? There would be, Your Honor, if Quicksilver had written the verdict questions the same way. They did not. There's a big difference, and as you can see without even reading the questions, one is a lot longer than the other. The false designation of origin question is a lot longer. It refers to ordinary purchasers and the source of goods. And as the evidence reflected, there was no evidence of confusion among what the jury thought were ordinary purchasers, consumers. And it's clear that made the difference for the jury because on re-deliberation, Quicksilver came in with a new definition saying, Aha, I forgot to define ordinary purchasers. Let me define it now. And that's what pushed the jury to change its answer. So that explains the inconsistency if there ever was one. There's not. And the law makes clear as long as any rational explanation can exist for the jury's finding, the first verdict has to stand. That's a perfectly rational explanation. And because of that, there was no inconsistent verdict, and the first verdict has to stand. Quicksilver has to accept the consequences of its action. It's important for the court to also remember, Quicksilver, after the verdict came out, did not go to sidebar and ask the district court to send the jury back to re-answer the confusion questions. It only asked for the district court to force the jury to answer these below questions about the statutory innocent use to get a complete record. So it didn't even point out any inconsistency. It was the district court that sua sponte tried to determine there was one. On latches, Your Honor, let me address the Internet issue one more time. As I think it's clear, the Internet existed in 2004. The evidence about whether retailers marketed on the Internet, that was available to Quicksilver in 2004. Whether it's sodded or not is not the fault of KMSTA. But Mr. Hacker suggests that there was evidence at the trial that between the first trial and the second trial, retailers were, in fact, using the Internet to specifically promote Roxyware as one of their products, and that there was no evidence that that was occurring in the prior years. That's correct, but there was a concern by Quicksilver back in 2004 that it could not control retailers. And the final point I'd make there is that even with that evidence of Internet marketing happening, the jury still found no harm. So it's kind of no harm, no foul. So retailers started marketing on the Internet. Big deal. The jury didn't think it was any issue. It didn't lead to harm. Quicksilver's own witness acknowledged there was no confusion because of that. The final point I'd make, Your Honor. I'm really out of time, so if you could wrap it up quickly, please. Sure. Certainly, Your Honor, is that Quicksilver focuses on the interchangeability of the labels. That conflicts with the jury's finding that there was a zone of reputation built by my client. It would disregard the value of that zone of reputation to suggest my client could just easily change. For those reasons, we think the entire judgment should be reversed and not left in some situation like Judge Trevisan left my client in. Thank you, Mr. Boone. Mr. Hacker, thank you, too. The case just argued is submitted.
judges: Bolton, Thompson, Silverman